Good morning, Your Honor. Steve Hubachek and Michelle McKenzie, Federal Defenders, on behalf of Arlene Whitney. Your Honor, I intend to address the Siebert and evidentiary hearing questions this morning. Just those two? Any other one you want, Your Honor. Okay. But with respect to the Siebert issue, Detective McDonough, when he went for the last interrogation Well, the first question is whether Siebert even applies, isn't it? I mean, Siebert happened after the events that we're talking about in this case, did it not? And don't we have a problem with Teague and existing precedent and all the rest of that stuff? I'm not sure Siebert even applies, does it? No, not at all, Your Honor. Under this Court's en banc decision in France, when the Court finds an AEDPA-qualifying error on one issue and here, like in France, the Court found an AEDPA-qualifying issue with respect to the harmless error analysis and because the harmless error analysis was flawed under AEDPA, then remaining issues such as whether or not the statement should be suppressed or such as the Feretta issue in France are reviewed de novo. De novo doesn't mean you get the Siebert. Which en banc are you talking about? France versus Harz. Hazy. Hazy, sorry. France versus Hazy. That doesn't mean you get the Siebert, the simple fact that it's a de novo review. We're still bound by the other constraints, are we not? No, not at all. Because this issue was resolved in Ms. Whitney's favor in the State court. So there's no AEDPA limitations at all. Well, wait a minute. I don't understand that. The statute says that all we get to decide in 2254 is whether the State acted contrary to or in violation of or contrary to or in an unreasonable application of Supreme Court law. And it really doesn't matter, I don't think, how they decided this or that question if they didn't. Well, I agree that's the standard, and that's the standard that Judge Moskowitz applied to the harmless error analysis. And once you have that error, then remaining issues such as the Feretta issue in the France versus Hazy case are reviewed de novo. Let me go back to the Teague question. I think there may be a misunderstanding about the applicability of Teague. Teague says that on collateral review it has nothing to do with AEDPA. In fact, the Supreme Court has not totally explained the relationship between AEDPA and Teague. But we know that under Teague, when a Supreme Court decision occurs after the conviction becomes final, which it had, then the new – unless it's a new rule of constitutional procedure, the decisions are not applicable. So Siebert doesn't qualify for retroactive applicability. So regardless of whether we're in de novo review or reviewing for AEDPA deference, Siebert simply isn't applicable. Well, Your Honor, Teague is all about comity and respect for State court judgments. Teague makes sure that this Court doesn't come back later on and upset such judgments by applying subsequent developments in the law. But that's not the case here. The California Court of Appeal found that all these statements should be suppressed, that the statements pre- and post-Miranda were supposed to be suppressed. But when was Siebert decided? Siebert was decided after. Yes. I mean, you just seem to be ignoring what appears to us to be a gigantic roadblock in your way. Well, I don't think it is a roadblock. Judge Aikuda expressed it more clearly than I did. I'm not sure we even get to Siebert. Well, I mean, I think that we do. And the reason I think that we do is, is that I'm not asking you to overturn a State court judgment on the Miranda issue. You're asking us to apply a case retroactively. No, no. See, what I'm asking is, is that you just follow the State court's original judgment, which is, is that these statements should be suppressed. But when I look at the State court's judgment, I have to evaluate it under ELSTAT, not under Siebert. That's right. Well, I don't know that there's any authority that says that when you have a favorable State court judgment that you're engaging in some wishful thinking here. You've got to show us that Siebert applies. Well, again, my main point is that Teague doesn't apply here because we're asking that you affirm a State court judgment and ask whether or not the statement should be suppressed. If you had a favorable State court judgment, Whitney wouldn't be in jail. She'd be free. Right. I had an unfavorable State court judgment on the harmless error issue, but I have a favorable State court ruling on the suppression issue. Let me ask about another step here. Just suppose you get past Teague. Basically, this is Miranda law. There's a serious question about whether she was in custody, the State resolved that question, which is a subordinate question in the analysis. In your favor. The next question is, was she properly Mirandized? The State court resolved that in your favor to the extent that they said she confessed before she was Mirandized. Then you get to ELSTAT. And ELSTAT says if the person confesses and then they're Mirandized and then they confess again, that's okay. The second confession is an independent act. It's the fact that the first one was before the Miranda warning doesn't matter. Then Siebert comes down and limits ELSTAT and it says, but that's not true if it's an intentional and deliberate attempt by the police to evade their Miranda obligation by using a deliberate two-step procedure where they get a confession, Mirandize, and then get the same confession again. If we get that far, if we get past Teague and apply Siebert, I don't see where there's any evidence for a two-step confession here. It looks to me like what happened was it wasn't the police that played any tricks or put on any particular pressure or anything. It looks like they were basically going after a boyfriend and he got down on his knees and he was sobbing and crying that she should tell the truth and she said, oh, all right then. And it came from the boyfriend. The police were all ready to grab the boyfriend for the murder. And then Whitney just falls under their lap. I don't see what you have for a deliberate two-step here. A lot. First of all, they weren't going after the boyfriend. This interrogation was instigated by what we call the Wildey hypothetical. A guy named Arthur Wildey tells Detective McDonough that Hendrickson, the boyfriend, told him a story about two women who got into a fight over a drug debt and one of them ended up dead. So the very next day, Detective McDonough goes out and gets Hendrickson, the boyfriend, and runs this hypothetical by him. Is this the hypothetical? Is this what you said? And he confirms it. Once he confirms it, then the suspicion is all on Whitney. And it was from the moment that he heard the Wildey hypothetical because it's a knife fight between two women. So that would necessarily implicate Whitney, not her boyfriend. So then he follows up and he basically follows the trail. And then he interrogates her until he gets an admission that confirms the hypothetical. Because he doesn't try to stop her. I thought they were interrogating the boyfriend and she was out sleeping on the couch. That's right. They interrogate Wildey, then they interrogate the boyfriend. Both of those result in implicating Whitney. Then he locks Whitney in a room, lets Whitney talk to Hendrickson, and then in that conversation Whitney learns that Hendrickson has told McDonough. Have I got the order of events right? I thought the policeman interrogated the boyfriend. The door locks like a hotel room door as far as I can tell. When it closes, it locks. He interrogated the boyfriend. The boyfriend came back crying to Whitney. And then the two of them are in there. And I think it was the boyfriend who said, can I talk to her for a minute without you here? So the cop goes out and eavesdrops. Right. And then the boyfriend is imploring her to tell the truth so he doesn't do the time. Well, he's imploring her to tell the truth so he doesn't have any liability. But the suspicion at this time is entirely focused on Whitney because she's the one that's the subject of the hypothetical. Okay, let's suppose, I don't want to just debate the point with you. Let's suppose that you read it that way. What is there to show that it was a deliberate two-step procedure to fall into the Siebert exception to L-STAT? A number of things. Number one, as you pointed out, Detective McDonough is monitoring this conversation. So he knows that Whitney has learned from Hendrickson that she has been implicated in the murder. Whitney says, I'm through. She swears a lot. I'm through, I'm done, and so on and so forth. And then when McDonough comes back knowing that Whitney has been implicated in the hypothetical and that she knows that she's been implicated in the hypothetical, he opens the door and her first words to him are, I'm ready, effing lock me up. There's absolutely no question that he knows at that point that she feels that she's in custody and he doesn't address it in his affidavit. I read Judge Moskowitz's approach to this case as finding as a matter of fact that there was not a two-step process. Am I wrong? I think that he did do that, yes, but without a hearing. Well, but he – and I understand you wanted an evidentiary hearing, but he said it's clear beyond any confusion at all to me, taking a look at all the evidence for me, that there wasn't a two-step process. He'd taken a look at all the information material. So you've got a finding of fact that's against you also that has to be clearly erroneous. Well, courts provide less deference to clearly erroneous fact-finding when it's done without any sort of evidence. But there are a number of reasons. Well, no, there was a ton of evidence. He said, I've looked at all the evidences before me and it's so clear we don't need any more. I misspoke. No live evidence, Your Honor. And the point is that – Well, where's a case that says if there's no live evidence we apply a different standard of review? Well, Earp v. Ornosky says that you shouldn't make credibility determinations based upon affidavits, and Blackledge v. Allison from the Supreme Court says the same thing. And that's what's happening here. Look, McDonough doesn't address the fact that Whitney told him that she was ready to be arrested. He doesn't even address it. He doesn't address the fact that she knew that she was implicated. He doesn't address the fact that his own department says that in this situation you should tell people that they can leave. Did you depose McDonough? No, we didn't depose McDonough. Did you have an opportunity to? Yes. Why not? I'll tell you why not, Your Honor, because there was no evidence in the record to support the government's position in this case under Williams. So you made a tactical decision not to depose McDonough? That's right, Your Honor. Well, now you're bound by that because the facts are found. You're telling us the facts aren't sufficient, but we find out you had an opportunity to amplify the record and you didn't take advantage of it. At the time that we made that decision, there was no affidavit that had been filed. The discovery cutoff was May the 5th. McDonough signed his affidavit on April 20-something of 1996 before the discovery cutoff. It was not disclosed to us. It was attached as an exhibit to a June 7 pleading. So we had no knowledge that there was this affidavit that he even made these claims. So under Ollie and Williams ---- You see, if you're willing to fly in the dark and you hit a mountain, that's not our fault. I mean, let's see, we're an appellate court. The time to develop this record was in the trial court. We've got a record. The question, of course, that we have to decide is whether there should have been an evidentiary hearing in excess. But now you tell me you had the opportunity to depose him and you didn't. That's right, Your Honor. But the thing is, there was no evidence in the record. Well, that doesn't help you very much. If there's no evidence, don't you lose? No, we win. Under Ollie, the burden is on the government to prove ---- I thought you needed to prove that it was a deliberate two-step process. No, the government needs to prove that it wasn't. Why do you think so? Pardon me? Why do you think the government has to prove it wasn't? Because, number one, United States v. Ollie from the Eighth Circuit held that. Plus, this Court in Williams has said that these facts taken together give rise to an inference of a deliberate process. So they have to rebut that. I don't remember Siebert being like that. And, of course, Eighth Circuit isn't binding on us. No, but Williams is, though. And Williams basically says the same thing. It says that ---- but you're right. There is no burden of proof discussion in Justice Kennedy's opinion. But Siebert says that these facts taken together give rise to an inference of deliberateness. Now, if I could just swing back to the Teague thing since I seem to have a real problem with that. If we're going to apply Teague, then you have to ---- I think you should look at whether or not the State Court's decision was reasonable at the time that it was made. Now, it applied ELSTAT in a way that this Court had actually endorsed in Your Honor's opinion, Pope v. Zenon. And the ---- I wrote Pope, but I wrote a dissent in Orso, too. You know, I was way out in front of this. I'm still out in front of the Supreme Court on this. I understand that. But if we're going to apply Teague ---- I am no fan of two-step processes, as you know. I've been reading all of your stuff, Your Honor. I know you're not. But my point is this, is that if you look at whether or not the State Court's decision was reasonable when it was made, which is a Teague-type analysis, it clearly was. Because your opinion was out there at the time this decision was made. The Eighth Circuit's Carter opinion was out there at the time that the State Court made its decision in this case. The Eleventh Circuit's opinion in Gale was out there at the time that this Court made its decision. So it's just ---- What we're doing is de novo. We're just attempting to apply the Supreme Court precedent to the case, right? Well, if we want to do de novo review, we're not going to ---- Well, it's not what we want to do. It's a question of what the analytical framework is. If, in fact, we say that the Chapman error was an unreasonable application of Chapman, so we're no longer deferring to the State Court decision, then it's subject to de novo review. We can't use Siebert retroactively. And so we're just looking at whether under ELSTAD there was a constitutional error so that the Petitioner is entitled to relief. So the question is, was there an error under ELSTAD? And if so, why? Well, the State Court found that there was, and that decision was reasonable at the time that it was made. But we don't defer to the State Court decision when we're doing de novo review. Well, if we're not going to defer, that's part of Teague. So it seems like I'm getting the detriment of Teague and not the benefit. I mean, the bottom line is, is that this is de novo review. The district court overturned the State Court's decision, you know, in violation of comity and respect for State Court judgments. And if it's going to do that, then it should have to rely upon the existing body of law. But even if you don't, under ELSTAD, there's still room under, you know, the Polk decision, the Carter decision and the Gale decision to endorse what the Court here did. And I think I'm over your red light. Thank you, counsel. Thank you, Your Honors. This is a seven balls in the air case. There's no doubt about that. Good morning, Your Honors. Barbara Mizell for Respondent. I have a link. The first issue I want to address, since the Court addressed that first, is the Teague issue. And the Court is correct in the sense that this was a new rule of law after the finality of the State Court judgment in this case. Siebert, as Your Honors probably know, came out after this Court had originally come to the Ninth Circuit out of the district court and asked that the district court review Siebert and see how that affected this case. So it came well after the finality of the judgment in this case. And it's not that none of the exceptions of Teague apply. Appellant's counsel did not even attempt to do that, and that's because none of those exceptions apply. This, in fact, is the new rule of law. Secondarily, on that same note, we also argue that this is unexhausted. We do recognize that under 28 U.S.C. 2254b-2, I believe, the Court can still reach the merits of this case in the sense of finding against Appellant. But since it is not exhausted, on the same basic concerns of the court, this particular issue was not addressed in the State court. Yes. It was not addressed in the State court. So you're saying if we found it to be retroactive, we should find that it wasn't exhausted. Is that your argument? That's correct, Your Honor. And that's because if we look at the Blair case from this Court, it was along the same lines of if you have a new decision like this that comes after the finality, in fact, that issue is not exhausted. Now, we also had the Hudson v. Russian case. But in footnote 2 of that case, it was speaking about whether or not particular cases were cited. This is not a case where it's simply that Siebert wasn't cited. It's a case in which you have a fundamental change in how we look at a Miranda violation, whereas, of course, under Elstad, we were talking about whether or not the first pre-Miranda statement was voluntary or involuntary. Now we have a whole different way of looking at it, which, of course, modifies Elstad, which is whether or not there was a deliberate violation on top of the law enforcement officer to do an end run around Miranda. Is the right analysis in your view, Elstad applies, the confession before the Miranda warning was harmless because of the confession after the Miranda warning. Siebert does not bar the confession after the Miranda warning because of Teague, and therefore, it's not contrary to an unreasonable application of, have I got the logic right? You know, and I'll try to clarify. The first thing is, is that, as Your Honors have said, under Teague, Siebert doesn't apply. And so what we would do is do an Elstad analysis on this particular case, which the district court did in its 2002 decision. So you're agreeing that we're doing de novo review because of the Chapman error. Is that your position? Your Honor, I know this will come as a surprise to felons counsel. This is a de novo review. After looking at Franski-Hazy, AEDPA is not going to apply. And we looked at it closely. This Court's case, Franski-Hazy, put that in perspective in the sense that it's the Court of Appeal, not just the decision that is entitled to deference. And so what happened here was, is that the district court looked at the fact that the Court of Appeal did not properly apply, did not properly apply Elstad. In fact, didn't apply Elstad at all. There was a fruit-of-the-poisonous-tree type decision, if you look closely at the Court of Appeal's opinion, where it says, okay, well, the second part of the post-Miranda statement had not, the taint had not been cleared from the first part. And fruit-of-the-poisonous-tree, as it says in Siebert, does not apply to an Elstad type analysis. The Court of Appeal completely got that wrong. And so what Judge Moskowitz said. I don't think that matters to us, does it? I mean, a state can be more protective of various rights of defendants than the Federal Government, and it just doesn't matter if they are to the Federal analysis, does it? Your Honor, I'm not sure what you're asking, but what I'm getting at is that what Judge Moskowitz did here was a de novo review himself, given the fact that it took it out of AEDPA, given the fact that the State court did not apply Elstad. It was the contrary thing to do. And the question is, as you know, for AEDPA, before we are relieved of AEDPA deference, we have to find, among other things, that the State's decision was contrary to an unreasonable application of Supreme Court precedent. Correct. There were two decisions. One was the State court's analysis of Miranda, and the other one was the State court's analysis of Chapman. Correct. And if I'm understanding Judge Heinfeld, he's saying, can we – are we relieved of AEDPA deference when the State court makes a constitutional error, but it's in favor of the Petitioner? Or is it only because of the Chapman error, which was – was that a constitutional error that was against the Petitioner? Or is it both? So that's the conundrum we have. Your Honor, I think it's both. I mean, I think under the Fransk as this Court's case, if there is a decision by the State court that is contrary to United States Supreme Court precedent, then, in fact, the noble review has to be put to that issue as to whether or not there's been a constitutional violation. Whether it's favorable or unfavorable. Whether it's favorable or whether it's not. Is there a case where the error by the State court has been favorable to Petitioner, where we've said that mistake relieves us of AEDPA deference? No, Your Honor, it hasn't. Because, of course, Fransk is, I believe, a 2007 case, so that's new in itself. So, no, I don't believe there's been a case since that particular time, no. But if we look at – so the position is that ELSTAT is what applies here, and if we look at the 2002 decision by the District Court, clearly here under ELSTAT, if we do the proper ELSTAT analysis, the second, the post-Miranda statement here, in fact, was – does come into evidence, and it did properly here, because the first statement was, in fact, voluntary. Ms. Whitney had come to the police station three previous times voluntarily, July 22nd, August 11th, and August 18th of 1994. And in those times she came to the station, she implicated a man by the name of David Mitch. First she had a story that there were five men in an Impala, a car that had come by, I believe, and picked up Ms. Jensen, the victim in this case. When that didn't pan out, her next story was that David Mitch, another person who was in Ms. Homeless' encampment, had, in fact, committed the murder. And this was, like I said, particularly on the 11th and 18th of August of 1994. She was so convincing about David Mitch committing the murder that they picked up David Mitch for the murder and, in fact, put him in jail. Ms. Whitney, after that or before that, actually gave a video reenactment of this particular murder of what David Mitch had done. So she had put on quite a show that had convinced the detective that, in fact, that David Mitch, another one of the homeless folks in this encampment, had committed this murder. And so on August 28th, she again comes there voluntarily with Hendrickson. She's sleeping on the couch, and I'm talking about an LSA type analysis. There was nothing here, you know, and Your Honor was direct about what happened. You had Hendrickson go in first. You had a wowsy type of hypothetical that Hendrickson said, in fact, had happened. He asked to talk to Whitney. They get put in the room together. You know, he implores her to tell the truth. But, in fact, she continues to say, no, David Mitch did it. David Mitch did it. And she pushed it. She was very forceful in pushing him away. Now, at the end of that, a felon's counsel mentions her talking about lock me up. What does that mean? I mean, Hendrickson was in the room with her, and he was the one telling her, tell the truth, tell the truth, tell the truth. What does lock me up mean? I mean, that doesn't say that she had committed the murder or anything like that. And so you have a situation where she goes into the room. He has her go into the room. And, Your Honor, as I assume, you know, you saw the video tape in terms of what happened there. If we're just talking about an LSAT analysis, there was nothing here whatsoever that made her original statement involuntary. And, in fact, I would say even if Siebert applied, our argument is clearly that Siebert does not apply. But I think it's important to talk about what if it did. Now, if Siebert applied, we'd be looking at whether or not he did a deliberate act or something deliberate to get a deliberate violation of Miranda. Absolutely not. As said in, as Judge Moskowitz said in his decision, the video tape is what, the video of what happened here is the compelling objective evidence under Williams that shows that he did not. I, you know, he sits down with her, and I assume Your Honors have seen it. He sits down with her, and before she can even, not only do you have the background, the setting. Let's talk, move back up. The setting in Williams, the Williams case talks about the setting and the completeness of the pre- and post-statements. Okay? If you look at the setting, not only do you have her coming here voluntarily for the fourth time, okay, you have her in the room. And if we talk about what happened in the pre-statement and the post-statement, obviously, Your Honors, you see she barely gets out anything before he stops her from talking. I mean, if we look at Siebert. Judge Moskowitz relied on that substantially. Also, what Judge Moskowitz relied on was that he, in granting discovery, he had specifically said that a deposition of McDonough was appropriate. And then when none was taken, he noted that Whitney's failure to produce any countervailing evidence, despite the discovery, in order for materials that could have impeached McDonough's contentions of good faith, was conclusive. Your Honor, that's correct. In Appellant's Counsel, we've been at this a long time. I mean, I look back at my notes. You have this statement from McDonough. We had many discussions over whether there would be a deposition. I mean, the affidavit was there. They knew about the affidavit. They could have deposed McDonough. Even if it wasn't, Moskowitz says, you want to depose McDonough, go right ahead. Well, yes, we had discussions over that. They could have deposed him. And, you know, and I would say on that issue, if we're talking about, if I just briefly talk about the evidentiary hearing issue, this Court's case, Woodford, that I cited in the briefing, talks about the fact that, in fact, a district court can do exactly what Moskowitz is doing here. In fact, you can expand the record in lieu of having an evidentiary hearing. And, in fact, if there's no reasonable chance that it would alter the decision, then there's no point in having an evidentiary hearing. And I would also say, under the Landrigan case, also cited, you know, if, in fact, there is enough evidence in the record in the district court, and there's no finding that appellant's counsel I mean, not appellant's counsel, but appellant has failed to develop a record in the state court, then, in fact, the Townsend factors do not apply. And so whether it be under What would you do in an evidentiary hearing? Usually what they're for is to get testimony about what happened at the interrogation. But I guess here the judge watches the interrogation on videotape. Right. So he watches it on television. And then you could have testimony about what happened before and after the camera was turned on. Your Honor, I think it would be a one-person evidentiary hearing. I mean, the only thing else you have here are two affidavits from Peretta and Whitbread, which were the two other officers that were involved in this investigation, simply attesting to the fact that there was no policy at the Oceanside Police Department to do deliberate violations of Miranda. And so, Your Honor, that's, like I was saying, whether it be under I remember in Siebert, I think it was in the manual on Siebert to do the two-step. Here there was no Yes. If there's testimony, they don't do that. And to speak to that, Your Honor, the distinction between it, and there was a case cited by appellant's counsel of Pacheco-Lopez. If we look at Pacheco-Lopez, I don't care if we look at that, Siebert, Williams, the reality, the difference here is you're not going to find a case where you have on videotape the detective trying to stop the person from talking before they even can get hardly two words out, or three or four words. Because the whole point in Siebert, and the whole point in these other cases, is to get at least a confession, whether it goes a beachhead. And the beachhead is not you get a few words out. The beachhead is get a confession for at least five, ten minutes. Get them talking. Get the basic confession. Then stop them. Okay, now we'll turn on the videotape. Now we'll make this look legit. Now we'll give you Miranda and videotape, and now we'll go into getting really detailed about your confession. I mean, that's not what happened here. It was very clear that he was trying to stop her from talking. And so on those points, Your Honor, and also, Your Honor, I would just say very briefly, in summing up, if you look at the affidavit itself, there was a supplemental letter by appellant's counsel that cited Craighead that went to the point of whether or not the affidavit itself, you know, was in fact a conclusionary allegations. In fact, of course, it was not, because the whole issue in this case was whether there was a deliberate violation, not whether or not the standard of a custodial interrogation was cited in the affidavit. It was whether he deliberately tried to violate Miranda. And so I wanted to address that issue. And, Your Honor, and also, frankly, Your Honor, that's, I think I've covered it. Unless Your Honors have any other questions, I think I'd simply submit at this time. Thank you, Counsel. Thank you. We have exhausted the time. Unless my colleagues have further questions for appellant, we'll submit. Whitney v. People is submitted. Thank you, Your Honor. Thank you, Counsel.
judges: Trott, Kleinfeld, Ikuta